IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| STEVEN F. HOTZE et al., | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 4:20-cv-2104 |
| GOVERNOR GREG ABBOTT, in his individual capacity, THE STATE OF TEXAS, TEXAS HEALTH AND HUMAN SERVICES COMMISSION (Texas HHSC), TEXAS DEPARTMENT OF STATE HEALTH SERVICES (Texas DSHS), PHIL WILSON, in his official capacity as Executive Director of Texas DSHS, JOHN WILLIAM HELLERSTEDT, MD,in his official capacity as Commissioner of the Texas DSHS, MAYOR SYLVESTER TURNER, in his official capacity as Mayor of the City of Houston, Texas, and HOUSTON FIRST CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COME NOW PLAINTIFFS STEVEN HOTZE, MD, et al (collectively "Plaintiffs") in the above-referenced case and file this Emergency Motion for Temporary Restraining Order and against Defendants Mayor Sylvester Turner in his official capacity ("Turner") and Houston First Corporation (collectively, "Houston Defendants").  Plaintiffs respectfully request that this Court immediately enjoin the Houston Defendants from violating Plaintiffs' constitutional rights by canceling the Texas Republican Convention set for July 16-18 in Houston, Texas.

**Brief Factual Background**

As detailed in Plaintiffs' First Amended Complaint and Application for Preliminary Injunction and Permanent Injunctive Relief ("Amended Complaint"), the Republican Party of Texas has been preparing to host the State Republican Convention for months.  (Exhibit "A", Plaintiffs' First Amended Complaint and Application for Preliminary Injunction and Permanent Injunctive Relief).  It was set to take place from July 16–18 at the George R. Brown Convention Center in Houston, Texas.  However, on July 8, 2020, George R. Brown Convention Center's landlord, Houston First Corporation, terminated its license agreement with Republican Party Texas at the direction of Defendant Turner.  Defendants' actions deny Plaintiffs the right to voice their support in person.  Defendants' claim that these actions are necessary to prevent transmission of the novel coronavirus, but as detailed in Plaintiffs' First Amended Complaint, the Houston Defendants have not shut down other large gatherings

**Argument**

**A.  The Applicable Legal Standard Warrants Issuance of a TRO**

The issuance of a Temporary Restraining Order ("TRO") is proper pursuant to Federal Rule of Civil Procedure 65. In determining whether to issue a TRO, the Fifth Circuit has set out the following four factors: (1) substantial likelihood of success on the merits; (2) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (3) that greater injury will result in denying the temporary restraining order than from its being granted; and (4) that a temporary restraining order will not disserve the public interest.  *Clark v. Princhard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc).The party seeking the TRO must satisfy a cumulative burden of proving each of the four

elements enumerated before a temporary restraining order can be granted. *See Miss. Power & Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985).

Here, Plaintiffs satisfy all four factors necessary for issuance of a TRO. The clear evidence of wrongdoing by Defendants firmly establishes that Plaintiffs will likely succeed on the merits of their claims that Defendants have violated their rights under First and Fourteenth Amendments to the United State Constitution.  As a result of Houston Defendants' actions in canceling the Texas Republican Convention, Plaintiffs will suffer immediate and irreparable harm because the Houston Defendants will have successfully prevented them from participating in this year's convention. Finally, granting a TRO will not disserve the public interest as it is foundational to the success of a democracy to ensure that all citizens are able to participate in the free exchange of ideas.  Further, granting a TRO will not disserve the public interest because the Texas Republican Party safely can host the Texas Republican Convention.

### B.  <u>There is a substantial likelihood that Plaintiffs will succeed on the merits</u>

***First Amendment Counts***

On July 8, 2020, Defendant Houston First Corporation sent a letter to State Chairman of the Republican Party, James Dickey, informing Dickey that Houston First Corporation was canceling its contract to host the Texas Republican Convention. Canceling the Texas Republican Convention is a severe limitation of Plaintiffs' political speech. Defendant Turner directed his legal team to look for any way possible to cancel the Convention, ostensibly as a result of the novel coronavirus. Defendant Turner's statements indicate that he was concerned about allowing the Texas Republican Convention to proceed because Turner claimed the gathering would threaten the City of Houston. The actions of Defendant Houston First Corporation, acting at Turner's behest

to cancel the Texas Republican Convention at the last minute, deprive Plaintiffs of their right to express their political beliefs, and make core political determinations.

The First Amendment to the United States Constitution provides that "Congress shall make no law abridging the freedom of speech, or of the press." U.S. Const. amend. I. The government may not regulate speech based on its substantive content or the message it conveys. *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828, 115 S.Ct. 2510, 2514, 132 L.Ed.2d 700 (1995). The First Amendment prohibits regulating speech in ways that favor some viewpoints or ideas at the expense of others. *Tex. Dept. Of Transp. v. Barber*, 111 S.W.3d 86, 92 (Tex. 2003). Regulations that impose different burdens on expression because of its content are presumed invalid and subject to strict scrutiny. *Id.* at 92. Content-based regulations are constitutional only if the regulation is narrowly tailored to serve a compelling state interest. *Id.* at 92–93.

In circumstances in which the regulations are content neutral, the First Amendment to the United States Constitution allows reasonable restrictions on the time, place, and manner of written and oral expression. *See id.* at 92. Content neutral regulations are subject to an intermediate level of scrutiny and are valid if they are narrowly tailored to serve a substantial government interest and do not unreasonably limit alternative channels for communicating the information. *Id.* at 93.

The divergence between Mayor Turner's statements and actions in response to the protests of the death of George Floyd and his response to the Texas Republican Party's plan to host the TRC suggest that the true reasons behind Mayor Turner's actions in forcing Houston First Corporation to cancel the TRC are not content-neutral regulations. (Exhibit "B"). Both events occurred during the COVID-19 pandemic and both events have the potential for virus transmission because they involve large groups of people gathering together. But Mayor Turner's actions in canceling the TRC while encouraging the protests suggests that Mayor Turner valued the

4

expression at the protests more than he values the expression of Republicans. The fact that Mayor Turner encouraged large protests while canceling the TRC suggests that Mayor Turner's regulation of speech was motivated by the viewpoint and content of the speech. Accordingly, Defendants' actions are presumptively unconstitutional. *See id*. at 92. Mayor Turner's actions in compelling Houston First to cancel the TRC are not narrowly tailored. Even presuming for the sake of argument that Mayor Turner and Houston First are acting on a compelling government interest, their actions are not narrowly tailored. Defendants Mayor Turner and Houston First canceled the entire convention rather than attempting to find a way to facilitate the freedom of expression while limiting virus transmission.

In the alternative, even presuming for the sake of argument that Mayor Turner and Houston First Corporation's reasons for canceling the TRC are content neutral, canceling the event at the last minute is not a reasonable restriction on the time, place, and manner of this core political expression. Canceling the event is not narrowly tailored to achieve a substantial government interest. As stated above, Defendants Mayor Turner and Houston First Corporation canceled the entire convention rather than attempting to find ways to allow it to proceed while limiting virus transmission. Further, there are no reasonable alternative means for communicating the information that Plaintiffs intended to communicate at the TRC. At the convention, Plaintiffs would take part in choosing delegates, electors, party chairs and would rally and encourage each other entering election season. Plaintiffs have been planning the TRC are unable at the last minute to find an alternative that will allow them to accomplish their goals. Accordingly, canceling the TRC violates the First Amendment to the United States Constitution because the action prohibits core political speech and is not narrowly tailored to serve a substantial government interest.

Similarly, the First Amendment provides: "Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment." *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1998).  An action abridging the freedom of association is subject to strict scrutiny and is valid only if it is narrowly tailored to serve a compelling state interest. *See id.* at 463, 1172.  As described above, the Houston Defendants' actions are not narrowly tailored to serve a compelling state interest.

### *Fourteenth Amendment Counts*

As described above, Defendant Turner embraced and participated in protests that expressed anger over the killing of George Floyd. These protests involved over sixty thousand people who spent hours in close proximity and did not undertake systemic precautions to avoid virus transmission. At the same time, Defendant Turner has canceled the TRC, an event that would be much smaller than the protests and where Party officials could ensure safety through undertaking precautions to avoid virus transmission.

The Fourteenth Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances, conditions, both in the privileges conferred and in the liabilities imposed." *Hayes v. Missouri*, 120 U.S. 68, 71–72, 7 S.Ct. 350, 30 L.Ed. 578 (1887). When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires a rational reason for the difference. *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 602, 128 S.Ct. 2146, 2153, 170 L.Ed.2d 975 (2008).  The actions of Defendant Turner and Defendant Houston First Corporation do not rationally relate to a legitimate government purpose, but instead are motivated by bias against the TRP. There is no need to shut down the TRC in order promote public health.

C.  **Plaintiffs Have Established a Substantial Threat of Immediate and Irreparable Harm for Which It has No Adequate Remedy at Law**

Plaintiffs have established that they will be harmed if they cannot proceed with the Texas Republican Convention this week. (Exhibit "C").  If the Texas Republican Convention is canceled, Plaintiffs will not be able to participate and express their political views at the Texas Republican Party's preeminent political event.  Plaintiffs will lose their opportunity to participate in self-governance, which is fundamental to the success of our country's Constitutional Republic.

D.  **The Threatened Injury to Plaintiffs Outweighs the Damage to the Houston Defendants and is not a Disservice to the Public**

The success of our country requires upholding the freedom of political speech. Accordingly, the threatened injury to Plaintiffs is significant.  It is a freedom that our forefathers fought and died to defend.  Protecting liberty is the critical to serving the public.  Further, granting the TRO will not harm the public because the Texas Republican Party can safely hold the Texas Republican Convention.  Houston Defendants issued six pages of guidelines for how to safely hold this event.

Attached is an affidavit from Edward Rensimer, M.D., FAC.  Dr. Rensimer is a medical doctor, certified in internal medicine and infectious diseases, and is licensed to practice medicine in the state of Texas.  Dr. Rensimer's affidavit addresses the COVID 19 numbers in Texas and Harris County, stating:

**"General Overview of Data in Texas for COVID-19**

As of Sunday,  July 12, 2020, according to the Texas Department of State Health Services ("TXDSHS"): a) there have been 258,658 confirmed and presumed cases of the coronavirus ("COVID-19") in Texas; b) **Texas COVID-19 incidence rate** – the number of cases of a disease in the Texas divided by the Texas population of approximately

30,000,000 - is approximately 8 out of 1,000, or 0.8% confirmed with or presumed to have COVID-19; and, c) there have been 3,192 confirmed or presumed deaths attributed to COVID-19.

[Ref.: https://dshs.texas.gov/coronavirus/TexasCOVID19DailyCountyCaseCountData.xlsx]

As of Sunday, July 12, 2020 according to the TXDSHS, the overall **Texas COVID-19 death rate** - the number of deaths in Texas – 3,192 - attributed to the disease in Texas - divided by the Texas population of approximately 30,000,000 – is approximately 1 out of 10,000 Texans or **0.01%.**

[Ref. https://dshs.texas.gov/coronavirus/TexasCOVID19DailyCountyCaseCountData.xlsx ]


**General Overview of Data in Harris County for COVID-19**

As of Sunday, July 12, 2020 according to the TXDSHS, there have been 43,939 confirmed and presumed cases of COVID-19 in Harris County.

**Harris County COVID-19 incidence rate** – the number of cases of a disease in Harris County divided by the Harris County population of approximately 5,000,000 - is approximately 9 out of 1,000, or .009% confirmed with or presumed to have COVID-19; and, c) there have been 425 confirmed or presumed deaths attributed to COVID-19.

[Ref.: https://dshs.texas.gov/coronavirus/TexasCOVID19DailyCountyCaseCountData.xlsx]

As of Sunday, July 12, 2020 according to the TXDSHS, the overall **Harris County COVID-19 death rate** - the number of deaths in Harris County – 425 - attributed to the disease in Harris County - divided by the Harris County population of approximately 5,000,000 – is approximately 1 out of 10,000 or **0.01%.**

[Ref. https://dshs.texas.gov/coronavirus/TexasCOVID19DailyCountyCaseCountData.xlsx ]

**Analysis of COVID-19 Relative to the Flu in the United States**

The United States Center for Disease Control (CDC) estimates that from October 1, 2019 – April 4, 2020, there have been upwards of 56 million flu cases. This means that the U.S. flu incident rate 56 million divided by 317,000,000 is 1 in 6 Americans or 17.6%. [Ref. https://www.cdc.gov/flu/about/burden/preliminary-in-season-estimates.htm]

The CDC estimates that there have been upwards of 740,000 hospitalizations and upwards of 62,000 deaths due to this year's flu. That is upwards of 344 deaths per day due to the flu since October 1, 2019. **The U.S. flu death rate** - the number of deaths in the U.S. – 62,000 deaths due to the flu in the U.S. - divided by the U.S. population of 317,000,000 – is 1 in 5000, or **0.02%.** [Ref: https://www.cdc.gov/flu/about/burden/preliminary-in-season-estimates.htm].

Compared to the **U.S. flu incident rate of 1 in 6, or 17.6%,** the Texas **COVID-19 incident rate is 8 in 1,000, or .08%**. **This means the incident rate of the flu in the U.S. is approximately 220 times more than COVID-19 incident rate in Texas.**

Compared to the **U.S. flu death rate of .02%,** the **Texas COVID-19 death rate is 1 in 10,000, or .01%. This means the death rate due to the flu in the U.S. is nearly 2 times more than the COVID-19 death rate in Texas.**

**Analysis of COVID-19 Relative to the Flu in the Texas**

During the flu season in Texas 2018 - September 26, 2019, the TXDSHS reported that there were 10,020 deaths due to pneumonia and flu (P&I). The Texas P&I incidence rate was 0.034% or over 3 in 10,000. This is triple the current death rate for COVID-19. There

has been no lock down of the flu related illnesses. There was no lock down during the 2018-2019 flu season, nor has there been any generalized lock down during any previous flu season.

[Ref.:https://www.dshs.state.tx.us/IDCU/disease/influenza/surveillance/2019/19Wk39Oct 04.pdf ].

The record shows there have been no widespread closings of businesses, churches, schools and public gatherings due to a flu epidemic in the U.S. since the Spanish flu epidemic of 1918, when it is estimated that 675,000 Americans died. The population of the U.S. in 1918 was 103,200,000. The death rate was 1 in 16 Americans or .6%.

During the Obama administration the swine flu (H1N1) epidemic occurred between April 12, 2009 and April 10, 2010. The CDC estimated that there were 60,800,000 cases of the swine flu in the U.S. and 12,469 deaths. President Obama did not declare a national emergency until October 24, 2009, six (6) months after the swine flu (H1N1) had been recognized.  In this incident, there was no lock down.

If the incident rate and the death rate, as aforementioned, for the annual influenza infection were the criteria for determining a public health hazard, and the basis for locking down Texas, the COVID-19 rates being less, would not constitute COVID-19 as a public health hazard, and therefore would not be a rational basis for a lock down.

If Americans and Texans were to react to the annual flu epidemic in the same way that people are reacting to COVID-19, then all Americans would isolate themselves from school, church services, work, and public gatherings for six (6) months annually during the flu season. But this is not what has occurred, and something Americans or Texans have not done.

Locking down and shutting down Texas and Harris County, based on the metrics available to date on COVID-19, seems to be setting a new norm – a new standard - for determining a public health hazard, and a new norm for the basis to shut down Texas.  If this is the new norm, a new paradigm will likely need to be created for the Texas and U.S. economy, if they are to survive in their current form.

## Standardizing Our "Concern" for Public Health

The recent events provide an opportunity to develop a standard for modulating our "concern" for public health – in general. Consider that every year upwards of 650,000 people worldwide die of respiratory illness related to the flu. That is 1,781 per day. A million and a half, or 4,109 per day, die of tuberculosis. Over 800,000 children die of diarrhea annually—2,192 deaths per day. There are 200 million cases of malaria every year and nearly 450,000 deaths. That is 1,232 deaths daily.

Below are some statistics about illness and death in the United States.  These statistics may vary; however, the error is likely to be no more than +/- 5% ("five-percent")

- **Iatrogenic** (Medical Errors incl. Prescription Drugs):   780,000 deaths/yr, 2136/day
- **Heart Disease:**                                          650,000 deaths/yr, 1,772/day
- **Cancer:**                                                 600,000 deaths/yr, 1,650/day
- **Traffic Deaths:**                                         37,000 deaths/yr, 100/day
- **Traffic Injuries:**                                       2.35 million/yr, 6,438/day
- **Lung Infections:**                                        160,000 deaths/yr, 438/day
- **Stroke:**                                                 146,000 deaths/yr, 400/day
- **Alzheimer's:**                                            121,000 deaths/yr, 332/day
- **Diabetes:**                                               84,000 deaths/yr, 230/day
- **Flu:**                                                    Ave. 50,000 deaths/yr, 278/day
- **Kidney Disease:**                                         51,000 deaths/yr, 140/day
- **Suicides:**                                               47,000 deaths/yr, 129/day
- **Abortions:**                                              800,000 deaths/yr, 2,192/day
- **Opioid/Narcotic Overdoses:**                              47,000 deaths/yr, 129/day
- **HIV/AIDS:**                                               56,500 new cases/yr, 155/day
- **STD Infections (gonorrhea, syphilis & chlamydia):** 2.4 million cases/yr, 6,575/day
- **Coronavirus (Jan. 21 – April 3, 2020):**                  6,593 deaths, 97/day

11

[Ref.:https://www.cdc.gov/nchs/fastats/leading-causes-of-death.htm].

If one considers that there are approximately 2.4 million injuries from traffic accidents every year, resulting in 37,000 deaths per year.  That means there are 6,575 injuries per day, and 100 deaths per day from traffic accidents. We as society no doubt acknowledge that this is significant and ongoing public health issue. However, there appears to be neither lock down orders being issued to stop driving nor outcry from our public health officials about eliminating all motor vehicles and forcing Americans to only travel via bicycles and horses. There has been no statute or regulation to lower speed limits to a level as to virtually preclude lethal outcome from motor vehicle accidents.

## **The Science**

When one rationally, with common sense, considers the current situation on COVID-19, the mathematics simply do not add up. The reaction – or, more specifically the over-reaction – is dissonant to the incident and death rates of COVID-19 situation, particularly given the data on the annual and daily death rates of other public health events.

The reality is that it is the over-reaction of a weakened and dysfunctional immune system. In fact, a true understanding of the immune system reveals that it is *not* just the pathogen or virus which damages cells and tissues, but rather the over-reaction via a "cytokine storm" of the individual's own immune system attacking their own tissue and cells.  The modern science of the immune system informs us that it is <u>the over-reaction of our OWN weakened and dysfunctional immune system attacking tissues and cells of our own body that harms and kills, versus the virus - be it COVID-19 or any other virus.</u>  In healthy individuals, the immune system processes pathogens with a natural immune response that

is mild and non-lethal; however, in those who are immuno-compromised - elderly and those with pre-existing conditions - their own immune systems may overreact or underreact; and in the case of COVID-19, attacking lung epithelial cells and tissues leading to hospitalization and mortality.

In the current situation with COVID-19, the infection inspires a "cytokine storm" in those that have weakened and dysfunctional immune systems. As one ages, the immune system has a tendency to become weakened.  Indicative of this is that the more serious symptoms, in the current situation, occur in those over the age of 60, who are debilitated and infirm, and those with pre-existing conditions, such as obesity, diabetes, heart disease, and chronic lung disease. The older and sicker the individual, the more severe the disease tends to be. Younger and healthier people are less likely to manifest serious symptoms, even if they are infected. If they do have any symptoms, then they will be mild or moderate, and they will recover. Up to 25% of those who have COVID-19 are without symptoms. As such, in Harris County, the current COVID-19 cases are much more skewed to those under 40 years old and so the mortality rate has actually declined somewhat, apparently due to the younger age of those infected. Effective treatment should be focused on those who are ill, and infection control measures focused on those at high-risk for severe illness and death.

Based on the principles of modern personalized medicine,  one size does not fit all, and from using our vast scientific understanding of pharmaceutical interventions, and infection control measures, wearing masks, hand cleansing, and social distancing, we should differentially support the four groups:  COVID-19 positive, those in critical care, immune-compromised individuals, and those who are healthy, by enabling them to support their

immune health, and end government lock downs and regulations for businesses, schools

and churches, so we can get our economy and lives back in order."

(Exhibit "D").

## Conclusion

The facts set out above establish that Houston Defendants' action violate Plaintiffs'

constitutional rights.  Plaintiffs are likely to succeed on the merits of their claims and the balance

of interests favors granting a temporary restraining order.  Accordingly, the requested Temporary

Restraining Order and Preliminary Injunction should be granted and the Houston Defendants

should be enjoined from canceling the Texas Republican Convention.


Respectfully submitted,

*/s/ Jared R. Woodfill*
Jared R. Woodfill
State Bar No. 00788715
WOODFILL LAW FIRM, P.C.
3 Riverway, Suite 750
Houston, Texas 77056
Tel: (713) 751-3080
Fax: (713) 751-3058
woodfillservice@gmail.com (service)
jwoodfill@woodfilllaw.com (non-service)
*Counsel for Plaintiffs*

14

**VERIFICATION**

STATE OF TEXAS

COUNTY OF HARRIS

Before me, the undersigned notary public in and for said county and state, on this day personally appeared Josh Flynn and after being duly sworn, stated upon his oath that his secretary of the Republican Party of Texas and a delegate to the Republican Party Convention, that he has read Plaintiffs' Verified Original Petition and Verified Application for Temporary Restraining Order, and that the factual statements contained in the Verified Original Petition and Verified Application for Temporary Restraining Order are true and correct based upon his personal knowledge.

_____
JOSH FLYNN

SUBSCRIBED AND SWORN TO before me this ____13th____ day of July 2020, to which witness my hand and seal.

CYNTHIA TAYLOR
Notary Public, State of Texas
Comm. Expires 10-05-2020
Notary ID 129153556

_____
NOTARY PUBLIC

15

## <u>CERTIFICATE OF CONFERENCE</u>

On July 13, 2020, the undersigned attorney called Defendants' counsel to confer regarding the above motion. Defendants' counsel stated that they oppose the motion.

*/s/ Jared Woodfill*
Jared Woodfill

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served via electronic mail on the following counsel for Defendants on this 13th day of July 2020:

*/s/ Jared Woodfill*
Jared Woodfill